## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

SHAWN D. SMITH, JR.,

                    Petitioner,             :     Case No. 3:20-cv-519

    - vs -                          District Judge Michael J. Newman
                                       Magistrate Judge Michael R. Merz

WANDA JACKSON MITCHELL,
  Warden, Warren Correctional Institution,

                                  :
                  Respondent.

## REPORT AND RECOMMENDATIONS

This is an action for writ of habeas corpus brought by Petitioner Shawn D. Smith, Jr., with the assistance of counsel. The Petition was filed December 28, 2020, but at counsel's request initial screening under Rule 4 of the Rules Governing § 2254 Cases was postponed until counsel could file an Amended Petition (ECF No. 5). In the meantime, the case has been reassigned to District Judge Michael J. Newman (ECF No. 4) as part of the adjustment of the Dayton docket following Judge Newman's confirmation.

Under Rule 4, the clerk must promptly forward a habeas corpus petition to a judge under the court's assignment procedure, and the judge must promptly examine it. If it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court, the judge must dismiss the petition and direct the clerk to notify the petitioner.

The Amended Petition recites that this case was tried to a jury in the Common Pleas Court

of Montgomery, County, Ohio, before The Honorable Michael Krumholtz in March 2017[1] (ECF No. 5, PageID 41).  Upon conviction, Petitioner was sentenced to an aggregate term of thirty-seven years to life imprisonment. *Id.* at PageID 41.  Petitioner appealed but the Ohio Second District Court of Appeals affirmed *State v. Smith,* 2018-Ohio-2567 (Ohio App. 2d Dist. Jun. 29, 2018)("*Smith I*"), appellate jurisdiction declined, 153 Ohio St. 3d 1487 (2018).  The Second District found the following facts were established at trial:

> [*P5]  On the morning of January 14, 2016, Jazmine Johnson left her 13-month-old son, Elijah, with Isaiah Smith ("Isaiah"), whom Johnson was dating.1 Johnson took Elijah to the home of Diana Hicks, Isaiah's grandmother. At some point, Isaiah left Hicks's home with Elijah and walked to the home of his (Isaiah's) mother, who lived a few houses away.

> [*P6]  On the afternoon of January 14, 2016, Dontay King went to common pleas court for unrelated cases, where he pled guilty to drug and gun charges. Expecting to be taken into custody, King had $2,500 with him so that the money would be placed in his account at prison. However, King was not taken into custody after the plea. King left the courthouse and went to pick up his friend, Smith, in a car he (King) had borrowed. While Smith and King were driving around, King received a call from Isaiah asking for some marijuana. King had met Isaiah through Isaiah's girlfriend, Johnson. King drove to the intersection of Queens Avenue and Dewitt Drive to meet Isaiah.

> [*P7]  At approximately 4:10 p.m., Isaiah got in the back passenger side of King's car, and King showed Isaiah the marijuana. Isaiah then pulled out a gun and pointed it at King's and Smith's heads. Isaiah told King and Smith to empty their pockets, and they gave Isaiah money and marijuana. King, who was armed, tried to pull out his gun, but Isaiah saw him. Isaiah pulled the trigger of his gun, but it did not go off. Isaiah then got out of the car with the money, a duffle bag of marijuana, and various documents belonging to King. King drove away, passing a school bus. Isaiah ran after and shot at the car. Isaiah then returned to his mother's home with the money and duffle bag.

> [*P8]  King drove toward Smith's home. According to King, Smith was angry and asked King how he knew Isaiah. At Smith's home,

---

[1] The weapons under disability count was tried to the court alone.

King noticed a bullet hole on the right fender. Smith went into his residence and shortly came back out.

[*P9] The two got back into King's vehicle and drove back to the area where they had been robbed, looking for Isaiah; Smith gave King directions to Hicks's (Isaiah's grandmother's) home; Smith told King that Isaiah would be at that house. King pulled over, and Smith fired multiple shots with a semi-automatic firearm at Hicks's house from the open passenger window of King's car.

[*P10] After Smith shot at Hicks's house, they continued driving and saw Isaiah nearby on the sidewalk; Isaiah was carrying the duffle bag that had been taken from King. (King testified that approximately 15 minutes had elapsed since Isaiah had robbed them.) An SUV and a blue Malibu were parked in front of the house (Isaiah's mother's house). According to King, King sped up, and as they approached, Isaiah began shooting at them. King testified that he could see that Isaiah was holding a small child in his other arm. King testified that Smith shot back at Isaiah through the open passenger window as King drove past.

[*P11] Hearing the gunshots, the SUV drove off. Isaiah entered the Malibu, his grandmother's vehicle, and he told Hicks that he had been shot. Hicks also drove off.

[*P12] King noticed that Isaiah had entered the blue Malibu, and Smith directed King to turn around and follow the Malibu. After the two cars turned onto Gettysburg Avenue, Smith told King to pull alongside the Malibu. After King pulled his car even with the driver's side of the Malibu, Smith fired several more times at the Malibu. Shots hit the Malibu; Hicks and Elijah were injured by the gunfire.

[*P13] Hicks turned onto Hillcrest Avenue, but King continued straight on Gettysburg Avenue. King and Smith no longer discussed finding Isaiah. King testified that he got rid of some bullet casings that had fallen into the car, and they switched to Smith's vehicle, a BMW. The two then went to take King's cousin's children to drill practice. Later than evening, King and Smith saw a news report about the shooting.

[*P14] Hicks drove Isaiah and Elijah to Good Samaritan Hospital, dropping them off at 4:30 p.m. Hicks drove off, but was later transported to Miami Valley Hospital. Elijah was transferred to Dayton Children's Hospital with multiple gunshot wounds, where he died from the gunshot wound to his torso.

[*P15]  King was apprehended the following day. He ultimately admitted his involvement in the shootings and identified Smith as the shooter. He also told the detective that Isaiah had used the baby as a shield. King later pled guilty to involuntary manslaughter and agreed to testify against Smith.

Defendant filed a petition for post-conviction relief under Ohio Revised Code § 2953.21 which the trial court dismissed without a hearing.  The dismissal was then affirmed on appeal. *State v. Smith*, 2019-Ohio-4483 (Ohio App. 2nd Dist. Nov. 1, 2019)("*Smith II*"); Petitioner does not report appealing further (Amended Petition, ECF No. 5, PageID 44).

Petitioner pleads three grounds for relief:

> **Ground One:**  The decisions of the Ohio judiciary denying the Petitioner relief upon his claim of a violation of his right to due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution were in error, as the Ohio courts erred in its analysis of the petitioner's *Batson* claim.
>
> **Ground Two:**  The decisions of the Ohio judiciary denying the Petitioner relief upon his claim of a violation of his right to due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution were in error, as the Ohio courts erred in excluding evidence regarding the victim's reputation for being dangerous and the Petitioner's awareness of the victim's violent nature.
>
> **Ground Three:**  The decisions of the Ohio judiciary denying the Petitioner relief upon his claim of a violation of his right to due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution were in error, in that the Ohio courts erred in permitting evidence of unindicted acts by the Petitioner to be admitted.

(Amended Petition, ECF No. 5, PageID 44).

# Analysis

**Statute of Limitations**

The Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA") adopted a statute of limitations for § 2254 cases which is codified at 28 U.S.C. § 2244(d) which provides:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of —
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> >
> > (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> >
> > (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

The Supreme Court of Ohio declined jurisdiction on direct appeal on September 26, 2018.

5

Smith's conviction on direct appeal then became final ninety days later on December 26, 2018[2], when his time for seeking review in the United States Supreme Court expired. The statute then expired one year later on December 26, 2019, unless it was tolled. A properly filed collateral attack on a criminal judgment will toll the statute under § 2244(d)(2). Smith filed his post-conviction petition June 14, 2018. *Smith II* at ¶ 3. There is no indication in the Second District's opinion that the post-conviction petition was not properly filed, so it tolled the statute until the Second District affirmed the trial court's dismissal on November 1, 2019. The statute began to run on that date and expired November 1, 2020. The original Petition in this case was not filed until December 28, 2020. This case is therefore barred by the statute of limitations and should be dismissed with prejudice on that basis.

Rule 2 of the Rules Governing § 2254 Cases requires that a habeas corpus petition must "substantially follow the form appended to these rules" unless the local District Court has prescribed a different form by local rule, which this Court has not. The standard form at item 18 provides that a petitioner must explain why the one-year statute of limitations does not apply if the conviction became final more than one year before filing. Counsel did not include in either the original or Amended Petition this information, so the Magistrate Judge is unaware of her position on this limitations question. If she files objections to this Report, she must include such an explanation.

The statute of limitations is an affirmative defense which is forfeited if not pleaded as required by Fed. R. Civ. P. 8(c). Of course, when dismissal is recommended at the Rule 4 stage, Respondent has not had an opportunity to plead the defense. However, the Supreme Court has held a district court may dismiss a habeas petition *sua sponte* on limitations grounds when

---

[2] Christmas was the ninetieth day, so the period for filing ran until the end of the next court day. Fed.R.Civ.P. 6.

conducting an initial review under Rule 4 of the Rules Governing § 2254 Cases. *Day v. McDonough*, 547 U.S. 198 (2006)(upholding *sua sponte* raising of defense even after answer which did not raise it); *Scott v. Collins*, 286 F.3d 923 (6th Cir. 2002). However, before doing so it must give the Petitioner notice and an opportunity to respond. *Shelton v. United States*, 800 F.3d 292 (6th Cir. 2015). Petitioner's opportunity to respond is provided by the objections period prescribed by Fed.R.Civ.P. 72(b).

**Merits Analysis**

**Ground One: Racial Bias in the Exercise of Peremptory Jury Challenges**

In his First Ground for Relief, Petitioner claims the prosecutor exercised a peremptory challenge in a racially-biased manner.

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court held the Equal Protection Clause[3] of the Fourteenth Amendment prohibits race-based peremptory challenges by a prosecutor. A state criminal defendant can establish a *prima facie* case of purposeful racial discrimination in the selection of jurors solely by proof of peremptory challenges to exclude members of the defendant's race.

A trial court must use a three-step process to evaluate a *Batson* claim. First, the opponent must make a *prima facie* showing that the proponent of the strike has exercised a peremptory challenge on the basis of race. The burden then shifts to the proponent to articulate a race-neutral reason for the challenge. Finally, the trial court must determine if the opponent has carried his

---

[3] Petitioner claims he was denied due process of law, but Batson was decided under the Supreme Court's separate doctrine interpreting the Equal Protection Clause.

burden of proving purposeful discrimination. *Purkett v. Elem,* 514 U.S. 765 (1995); *Hernandez v. New York*, 500 U.S. 352 (1991). To make a *prima facie* showing, a defendant must show that he is a member of a cognizable racial group, that a challenge has been exercised to remove a venireperson of the same race, and any additional facts and circumstances from which an inference could be drawn that the prosecutor had used the peremptory challenge in a race-based manner. *Batson,* 476 U.S. at 79. The defendant is entitled to rely on the fact that the peremptory challenge process is one in which those who are of a mind to discriminate on the basis of race are able to do so. *Id*. A trial judge's conclusion that the challenge was race-neutral must be upheld unless it is clearly erroneous. *Hernandez*; *supra*; *United States v. Tucker*, 90 F.3d 1135, 1142 (6th Cir. 1996); *United States v. Peete*, 919 F.2d 1168, 1179 (6th Cir. 1990). A *Batson* error is never harmless, but rather is a structural error. *United States v. McFerron,* 163 F.3d 952 (6th Cir. 1998), relying on *Arizona v. Fulminante,* 499 U.S. 279 (1991).

Smith raised his *Batson* claim on direct appeal to Second District in *Smith I* and the court decided the claim as follows:

> [*P30] In his first assignment of error, Smith claims that the trial court erred in denying his *Batson* challenge to the State's use of a peremptory challenge on Prospective Juror #5, J.N. Smith claims that the trial court improperly failed to proceed to the third prong of the *Batson* test and determine whether the State's reason for the peremptory challenge was credible and not pretextual.
>
> [*P31] In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that the Equal Protection Clause forbids the State from exercising a peremptory challenge to excuse a juror solely because of that juror's race. See also *State v. Murphy*, 91 Ohio St.3d 516, 2001- Ohio 112, 747 N.E.2d 765 (2001) (applying *Batson*). "The Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race, or on the false assumption that members of his race as a group are not qualified to serve as jurors[.]" (Citations omitted.) *Batson*, 476 U.S. at 86. The Supreme Court subsequently extended Batson to criminal

defendants who are not of the same race as the excluded jurors. *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). The Supreme Court has since held that the exercise of a peremptory challenge based on a prospective juror's gender also violates the Equal Protection Clause. *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S. Ct. 1419, 128 L. Ed. 2d89 (1994).

[*P32] The Supreme Court has made clear that the harm that results from discrimination in jury selection is not limited to the harm caused to the litigants.

> Discrimination in jury selection, whether based on race or on gender, causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process. The litigants are harmed by the risk that the prejudice that motivated the discriminatory selection of the jury will infect the entire proceedings. The community is harmed by the State's participation in the perpetuation of invidious group stereotypes and the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders.

*J.E.B.,* 511 U.S. at 140. Thus, "whether the trial is criminal or civil, potential jurors, as well as litigants, have an equal protection right to jury selection procedures that are free from state-sponsored group stereotypes rooted in, and reflective of, historical prejudice." *Id.* at 128; see also *Powers v. Ohio,* 499 U.S. 400, 409, 111 S.Ct. 1364, 113 L.Ed.2d 411 ("An individual juror does not have a right to sit on any particular petit jury, but he or she does possess the right not to be excluded from one on account of race.").

[*P33] *Batson* established a three-step analysis for trial courts to decide claims of race-based challenges to jurors:

> First, a defendant must make a prima facie case that the prosecutor is engaged in racial discrimination. Second, if the defendant satisfies that burden, the prosecutor must provide a racially neutral explanation for the challenge. Finally, the court must decide, based on all the circumstances, whether the defendant has proved purposeful racial discrimination. In doing so, the court must consider the circumstances of the challenge and assess the

9

plausibility of the prosecutor's explanation in order to determine whether it is merely pretextual.

(Citations omitted.) *State v. Johnson,* 144 Ohio St.3d 518, 2015-Ohio-4093, 45 N.E.3d 208, ¶ 21. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); see also *State v. Evans*, 2d Dist. Montgomery No. 27178, 2017-Ohio-8184, ¶ 27 ("The prosecutor's articulation of multiple race-neutral reasons for the peremptory strike renders moot whether Evans established the first step of a prima-facie case.").

[*P34]   "Review of a *Batson* claim largely hinges on issues of credibility. Accordingly, we ordinarily defer to the findings of the trial court. * * * Whether a party intended to racially discriminate in challenging potential jurors is a question of fact, and in the absence of clear error, we will not reverse the trial court's determination." *Hicks v. Westinghouse Materials Co.,* 78 Ohio St.3d 95, 102, 1997-Ohio 227, 676 N.E.2d 872 (1997). See also *Johnson* at ¶ 23; *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 53. Neither the effectiveness of *Batson* nor the wisdom of allowing peremptory challenges is before us. Compare, e.g., *State v. Saintcalle,* 178 Wash.2d 34, 309 P.3d 326 (2013) (discussing racial discrimination in jury selection and the shortcomings of *Batson*).

[*P35]   The prosecutor and defense counsel each spoke with J.N. during voir dire. The prosecutor had the following exchange with her:

> [PROSECUTOR]: All right. And again, we're talking about, where we started was somebody who knows somebody who's been convicted or charged or investigated or gone through diversion programs. Does that apply to anybody here? I saw some hands. I see one over here. [J.N.]? PROSPECTIVE JUROR [J.N.]: I'm a caseworker so mental health and drug unit so –
>
> [PROSECUTOR]: That's pretty much what you do.
>
> PROSPECTIVE JUROR [J.N.]: Yeah.

[PROSECUTOR]: And you deal with every day. Where do you work?

PROSPECTIVE JUROR [J.N.]: South Community.

[PROSECUTOR]: Okay. So and there's a lot of South Community association with reports and rehabilitative programs.

PROSPECTIVE JUROR [J.N.]: Uh-huh.

[PROSECUTOR]: What's your specific job?

PROSPECTIVE JUROR [J.N.]: A caseworker with the health and drug unit so.

[PROSECUTOR]: So you're dealing with a lot of people who are seeking court-ordered help?

PROSPECTIVE JUROR [J.N.]: Some of them.

[PROSECUTOR]: Okay. And then people come to you from other directions as well?

PROSPECTIVE JUROR [J.N.]: Uh-huh.

[PROSECUTOR]: There is elements of drug abuse in this case. There's elements -- they [sic] are going to be drugs that were found and maybe people who were using drugs. So that's going to sort of be something that you're going to hear a lot about in this case. It's certainly going to be around the edges. How do you feel that -- do you feel that basically what you know in your experiences that you could be fair and listen to this evidence?

PROSPECTIVE JUROR [J.N.]: Yeah, but we have a different (indiscernible). I can treat everybody differently what their situation is so.

[PROSECUTOR]: Have you encountered people in your job that you feel have been treated fairly by the criminal justice system?

PROSPECTIVE JUROR [J.N.]: Yes.

11

[PROSECUTOR]: Have you encountered people in your job that you feel have been treated unfairly by the criminal justice system?

PROSPECTIVE JUROR [J.N.]: Yes.

[PROSECUTOR]: Okay. Which do you encounter more?

PROSPECTIVE JUROR [J.N.]: Fairly.

[PROSECUTOR]: Fairly?

PROSPECTIVE JUROR [J.N.]: Uh-huh.

[PROSECUTOR]: With respect to the unfairly does that have something to do with sometimes we don't always do a great job of finding mental health, drug addiction, and handling those kind of problems?

PROSPECTIVE JUROR [J.N.]: Yes, ma'am.

[PROSECUTOR]: Okay. And programs like there's not very many out there that handle dual diagnosis?

PROSPECTIVE JUROR [J.N.]: Uh-huh.

[PROSECUTOR]: Like your department does. Do you feel that you would be extra hard on the State of Ohio or the state's witnesses to make sure that and sort of make our burden any higher because of your job?

PROSPECTIVE JUROR [J.N.]: No.

[PROSECUTOR]: Okay. You could come in with fresh eyes and be fair?

PROSPECTIVE JUROR [J.N.]: Uh-huh, yes.

[PROSECUTOR]: Thank you, ma'am.

(Trial Tr. 66-68.)

[*P36] During defense counsel's voir dire questioning, he asked different prospective jurors about their experiences and whether

they believed they would be fair jurors. Defense counsel had the following exchange with J.N.

> [DEFENSE COUNSEL]: Okay. [J.N.], you've had a lot of life experiences that would put you in connection with people that, well, maybe your life experiences are like mine. We see a lot of people in a lot of different situations.
>
> PROSPECTIVE JUROR [J.N.]: Sure.
>
> [DEFENSE COUNSEL]: And do you think that makes you a better juror or a tainted juror?
>
> PROSPECTIVE JUROR [J.N.]: I don't think I'm better than anybody so I wouldn't be a better juror. I can try to differentiate from the facts, from what other people say and kind of make my decision based off that, the facts.
>
> * * *
>
> [DEFENSE COUNSEL]: Do you think your line of work in any way has slanted your view of things or you think it's actually evened it out more?
> PROSPECTIVE JUROR [J.N.]: I think it's evened it out.
>
> [DEFENSE COUNSEL]: Yeah.
>
> PROSPECTIVE JUROR [J.N.]: I see both sides of each, the wrong and the good of people.
>
> [DEFENSE COUNSEL]: Thank you.

Trial Tr. at 131-132.

 [*P37] In chambers, the State exercised its first peremptory challenge to excuse J.N. Defense counsel objected under Batson. The court asked defense counsel to indicate what facts and circumstances raised an inference that the peremptory challenge was used to exclude J.N. on the basis of race. Counsel stated:

> Shawn Smith, for the record, is black or African-American. There are only three black jurors not only in the 12 but in the entire panel that's remaining.

> [J.N.] seemed like she was a well-educated person who had no answers to any question from the prosecution or from the defense that would raise a concern. And so that's the reason why we're making the claim.

[*P38] The trial court then provided the prosecutor an opportunity to respond. The prosecutor told the court:

> I don't believe this actually comes down to the race of defendant nor any more so than it comes down to the race of the baby who was also African-American, black child, and as is virtually all the witnesses in the case. The state's motion has nothing to do with the race of the juror. It has to do with the fact that she is in behavioral healthcare which is a sociological, psychological kind of role that always concerns the state and that type of behavior, in that type of employment because they're very much people in line of work are often very much looking for the good in people.
>
> And she even expressed that as she was talking about she was working with people who are suffering from mental health and from drug addiction. And she's seen, in her opinion, people who have been fairly treated by the law but also some people who have been unfairly treated by the law. And based upon her work with that community of people who have mental health problems and drug problems, she has some views about that. The state is concerned about that. The state is concerned with a propensity based upon her employment and based upon her choice of career to be more sympathetic to the defendant and follow sympathy as opposed to what the facts are, what the law is. And the state would be making this request regardless of her race.

(Trial Tr. at 171-172.)

[*P39] Defense counsel responded to the prosecutor's statement, saying, "None of her answers would be supportive of that -- of those conclusions drawn. She seemed to indicate that she would be fair and impartial and sides with neither the defense nor the state." (Trial Tr. at 172.)

[*P40]  The trial court overruled the *Batson* challenge, reasoning:

> I overrule the *Batson* challenge. I think the state has articulated a race-neutral reason. The employment work history of the prospective juror in question, certainly she's in a social service agency which can be seen as the career path of someone who, to their credit, has a strong sense of the good in all people and a sense of helping people having difficulty which is separate and distinct from any race-based reason for the challenge.

> I believe the defense has not made a prima facie showing that the prosecutor has exercised that peremptory challenge on their [sic] basis of race. Therefore, I overrule the *Batson* challenge and we do not go to the second stage or prong of the Batson analysis.

(Trial Tr. at 172-173.)

[*P41]  On appeal, Smith claims that the trial court improperly applied the Batson three-prong analysis by failing to reach the third prong.

[*P42]  After defense counsel indicated that he wished to make a *Batson* challenge, the trial court, as required by the first *Batson* prong, asked defense counsel to articulate the reasons for the challenge. Counsel explained that he found no basis for the State's peremptory challenge. We construe defense counsel's argument to be that, in the absence of an apparent proper basis for the State's peremptory challenge, the trial court should infer that the prosecutor exercised the challenge on the basis of race, especially given defense counsel's reference to the racial composition of the venire.

[*P43]  Although the trial court later indicated that it did not need to move on the second prong of the *Batson* test, the trial court asked the prosecutor to respond to defense counsel's argument. In so doing, the prosecutor provided what she represented as a racially neutral explanation for the challenge. Specifically, the prosecutor emphasized J.N.'s occupation, contact with individuals with mental health and drug addiction issues, and her views on how clients have been treated by the court system as the bases for the challenge. The prosecutor's articulation of a race-neutral reason satisfied the second prong of the *Batson* test and rendered moot whether defense counsel had demonstrated a prima facie case of racial discrimination.

15

[*P44] The trial court provided defense counsel an opportunity to respond before it ultimately ruled on defense counsel's *Batson* challenge. After defense counsel responded, the trial court found that the prosecutor had offered a race-neutral explanation for the peremptory challenge.

[*P45] The State argues that the trial court satisfied its obligation under the third prong when it considered and evaluated the prosecutor's race-neutral explanation for striking J.N., found the explanation to be credible, and overruled the *Batson* challenge. The State further argues that, "while the trial court did not explicitly find that the prosecutor's explanation for striking [J.N.] was credible, that finding is implicit in its stated rationale for overruling Smith's Batson challenge, and the trial court's finding is not clearly erroneous."

[*P46] Under *Batson's* third prong, the trial court was required to decide, based on all the circumstances, whether purposeful racial discrimination had been proved. After the prosecutor articulated her reason for excusing J.N., the trial court did not expressly state that it found the prosecutor's stated rationale to be credible or that the prosecutor's explanation was not a pretext for purposeful discrimination.

[*P47] Nevertheless, in rejecting Smith's *Batson* challenge, the trial court considered the prosecutor's reasons for the challenge, and it expressly commented that J.N. did work for a "social service agency[,] which can be seen as a career path" for individuals who strongly wish to help others and see the good in others. We agree with the State that the trial court implicitly found not only that the prosecutor's reasons for the peremptory challenge were race neutral, but also that they were credible and not a pretext for discrimination.

[*P48] We recognize that the trial court created ambiguity when it concluded with "I believe the defense has not made a prima facie showing that the prosecutor has exercised that peremptory challenge on their basis of race. Therefore, I overrule the *Batson* challenge and we do not go to the second stage or prong of the *Batson* analysis." We encourage trial courts to scrupulously follow *Batson's* three-prong structure and to clearly articulate their credibility findings. Nevertheless, given the entire record before us, it appears that the trial court considered all the circumstances of the challenge, assessed the plausibility of the prosecutor's explanation, and found the prosecutor's stated reasons to be credible. We find no clear error in the trial court's determination.

16

[*P49] Smith's first assignment of error is overruled.

*Smith I.*

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 785 (2011); *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000). Deference is also due under 28 U.S.C. § 2254(d)(2) unless the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

Petitioner argues the state court findings rejecting his *Batson* challenge

> are poppycock. First, the potential juror expressed an ability to judge the case free from bias. Second, one would hope that most citizens are "very much looking for the good in people." However, such does not have any baring [sic] on whether a juror can perform her duties in an unbiased manner. Third, if knowledge of individuals who have been mistreated by the legal system can act as a bar to service on a jury, than [sic] the potential juror pool would be exponentially reduced. Fourth, as noted by the State, the potential juror was an educated professional. One would assume that such an individual was aware of the meaning of her statements regarding her ability to judge the case fairly. Quite simply, the State's purported reason for striking the jury do not withstand scrutiny. The State's strike of potential juror #5 was based upon race.

(Memorandum, ECF No. 5, PageID 53-54).

Evaluating the Second District's decision under 28 U.S.C. § 2254(d), the Magistrate Judge concludes it is entitled to deference. Judge Froelich explicitly recognized the binding nature of *Batson* and the three-stage analysis called for by *Batson* and its progeny. Thus the decision is not contrary to Supreme Court precedent.

17

Nor does it unreasonably apply *Batson* and its progeny.  Petitioner points to no Supreme Court holding that would require upholding a *Batson* challenge in the circumstances presented here.  The prosecutor certainly presented a race-neutral explanation of the challenge:  the nature of the prospective juror's chosen career in a helping profession.  Petitioner has made no showing that this is somehow a proxy for race discrimination, e.g., that persons in that profession are overwhelmingly Black.

The prospective juror certainly professed that she could be unbiased, but a vast array of recent literature shows that persons harbor implicit biases which even they may not recognize or be unable to overcome even if they do recognize them.  See Jennifer L. Eberhardt, Biased: Uncovering the Hidden Prejudice That Shapes What We See, Think, and Do.  That is as true of professionals, including judges, as it is of others.

Of course, if the prospective juror had admitted to bias, there would have been no need to challenge her peremptorily; she could have been excused for cause.  The very existence of peremptory challenges – the ability to excuse a juror without good cause to do so – opens a pathway for an attorney to rely on the implicit biases that guide his or her decisionmaking.  That is why the Supreme Court decided *Batson* as it did.  But until and unless peremptory challenges are abolished altogether, the judicial system must rely on the good faith assessment of credibility by the trial judge.  Here Judge Krumholtz found the prosecutor had exercised the peremptory challenge on a race-neutral basis.  Applying a clear and convincing evidence standard, the Second District found that determination was entitled to deference.  As we would in evaluating a sufficiency of the evidence claim under *Jackson v. Virginia*, 443 U.S. 307 (1979), we must defer to both the trial judge and the appellate court.  See *Tucker v. Palmer*, 541 F.3d 652 (6th Cir. 2008); *accord, Davis v. Lafler,* 658 F.3d 525, 531 (6th Cir. 2011)(en banc); *Parker v. Matthews*, 567 U.S. 37, 43 (2012).

One can imagine circumstances in which a trial judge's assessment of prosecutor credibility would be factually unsustainable under 28 U.S.C. § 2254(d)(2), for example if the prosecutor were an open and notorious leader of the Ku Klux Klan[4]. But Petitioner has pointed to no facts in the record that show this prosecutor was known to be racially biased.

The burden of persuasion on a *Batson* challenge always remains with the party opposing the peremptory challenge. *Rice v. Collins*, 546 U.S. 333, 338 (2006). Petitioner asserts in his Amended Petition that he is entitled to an evidentiary hearing to prove his case, including perhaps proof that Judge Krumholtz misjudged the good faith of the prosecutor here. But the availability of evidentiary hearings in habeas corpus has been severely restricted by the Supreme Court. *Cullen v. Pinholster*, 563 U.S. 170 (2011). To overcome the state courts' finding that the prosecutor's race-neutral explanation was pretextual, Petitioner must point to evidence already of record which overcomes that finding by clear and convincing evidence. 28 U.S.C. § 2254(e).

The Second District's decision of Petitioner's *Batson* claim is a reasonable application of *Batson* and its progeny and is therefore entitled to deference. Petitioner's First Ground for Relief should be dismissed on the merits.

## Ground Two: Exclusion of Evidence of the Victim's Reputation for Violence

In his Second Ground for Relief, Smith asserts he was denied due process of law when the trial court excluded "evidence regarding the victim's[5] reputation for being dangerous and the Petitioner's awareness of the victim's violent nature."

---

[4] Hugo Black became a United States Senator with Klan support. When he was nominated for the Supreme Court, it was necessary to conceal that information until he was confirmed. See - Noah Feldman, Scorpions: The Battles and Triumphs of FDR's Great Supreme Court Justices.

[5] The victim in question is Isaiah Smith, not the infant who was killed.

Smith presented a claim about the exclusion of this evidence to the Second District which decided it as follows:

> [*P50]  In his second assignment of error, Smith claims that the trial court committed reversible error by excluding certain testimony from Smith regarding Isaiah's propensity for violence and specific acts of violence by Isaiah. Smith asserts that the evidence regarding Isaiah's character was admissible under Evid.R. 404(A)(2) and that the evidence regarding Isaiah's specific acts of violence was admissible under Evid.R. 405(B). Smith further asserts that the testimony was relevant to his claim of self-defense.
>
> [*P51]  Relevant evidence is generally admissible whereas irrelevant evidence is not. Evid.R. 402. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 402; Evid.R. 403(A).
>
> [Quoted texts of Ohio R. Evid. 404(A) and 405 omitted.]
>
> [*P54]   A trial court has broad discretion to admit or exclude evidence, and its exercise of that discretion will not be disturbed on appeal absent an abuse of discretion. *State v. Norris,* 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 14. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34.
>
> [*P55]  Prior to King's testimony, the trial court and counsel had an extensive discussion about the admissibility of evidence regarding Isaiah's prior wrongful acts. Defense counsel indicated that King would testified that, during the robbery of King and Smith, Isaiah told them, "You already know what I did to Devo," referring to a person who had been murdered a year before the robbery. Counsel indicated that King had also heard that Isaiah had killed multiple people, and that King would testify that he (King) and Smith spoke at length about Isaiah's reputation for violence. Defense counsel argued that Smith would have known about these other events to the same degree as King.

[*P56] The trial court disallowed King's proposed testimony, indicating that "Dontay King can talk about his own state of mind but he can't talk about the state of mind of another person"; Smith alone could talk about his own state of mind. (Trial Tr. at 286.) The court further emphasized that Smith's and King's experience with Isaiah during the robbery provided strong evidence that Smith might have a reasonable belief that he was in imminent danger of death or great bodily harm from Isaiah. The court found, in contrast, that vague allegations that Isaiah had harmed others and was dangerous would "invite the jury to go on a detour." In other words, the court found that the probative value of that evidence was substantially outweighed by the danger of confusing the issues. (Trial Tr. at 290-291.)

[*P57] The issue arose again prior to Smith's testimony in his own defense. The court ruled:

> All right. I maintain my ruling made earlier in the case that using Evidence Rule 403 as my baseline, I do not find that such evidence is admissible. The only purpose for such evidence would be to indicate that Shawn Smith had a justifiable fear of Isaiah Smith during the events in question. In fact, the evidence in the case to this point, I expect it to be reinforced here in a few moments, is that Isaiah Smith perpetrated a robbery upon the persons of Dontay King and Shawn Smith, at gunpoint; that in the course of that robbery he even went to the extent of pointing his gun at the head of Dontay King, squeezed the trigger of the gun and fortunately for Dontay King, the gun did not fire. That evidence, in my mind[,] is abundant and clear in creating a justifiable fear on the part of both Shawn Smith and Dontay King that I'd say Smith was a dangerous person unto a threat of death; a threat to life, on the part of Isaiah Smith.
>
> So I think evidence as to his character and propensity to violence on other occasions is miniscule in terms of its probative value and compared to what's already clear in the record and I think the admission of that evidence would cause confusion of the issues which under Evidence Rule 403(A), requires the court to preclude the evidence.
>
> I think it also leads to a cumulative presentation which under 403(B) permits me on a discretionary

21

basis to preclude the evidence. I elect to do both. I
will not permit the evidence.

(Trial Tr. at 860-861.)

 [*P58]  We find no abuse of discretion in the trial court's ruling. For
purposes of Smith's claim of self-defense, Smith was required to
demonstrate that he "had a bona fide belief that he was in imminent
danger of bodily harm." E.g., *State v. Brown,* 2017-Ohio-7424, 96
N.E.3d 1128, ¶ 24 (2d Dist.). The trial court reasonably concluded
that Isaiah's (undisputed) robbery of Smith and King -- in which
Isaiah pointed a gun at King and pulled the trigger, and then
subsequently shot at King's vehicle as King drove away - strongly
demonstrated both Isaiah's dangerousness and Smith's justifiable
fear of Isaiah. The court further reasonably concluded that additional
information about Isaiah's reputation in the community and his
claim of responsibility for the death of another individual would
have provided little additional benefit to Smith, but would have
invited the jury to "detour" into unrelated crimes by Isaiah.

*Smith I.*

Petitioner asserts that exclusion of the proffered evidence violated his rights under the Due

Process Clause (Amended Petition, ECF No. 5, PageID 54-58).  However, the Magistrate Judge

concludes this Due Process claim is procedurally defaulted because it was not fairly presented to

the Second District as a constitutional claim, but instead only as a claim under the Ohio Rules of

Evidence.

To preserve a federal constitutional claim for presentation in habeas corpus, the claim must

be "fairly presented" to the state courts in a way which provides them with an opportunity to

remedy the asserted constitutional violation, including presenting both the legal and factual basis

of the claim.  *Williams v. Anderson,* 460 F.3d 789, 806 (6th Cir. 2006); *Levine v. Torvik*, 986 F.2d

1506, 1516 (6th Cir.), *cert. denied,* 509 U.S. 907 (1993), overruled in part on other grounds by

*Thompson v. Keohane,* 516 U.S. 99 (1995); *Riggins v. McMackin,* 935 F.2d 790, 792 (6th Cir.

1991). The claim must be fairly presented at every stage of the state appellate process. *Wagner v.*

*Smith,* 581 F.3d 410, 418 (6th Cir. 2009).

There are occasions when a state court defendant will have made claims in the state courts which, while not explicitly invoking the United States Constitution, in fact fairly place before the state courts the substance, both facts and legal theory, of a claim or claims later made in habeas corpus.

> [T]he ways in which a state defendant may fairly present to the state courts the constitutional nature of his claim, even without citing chapter and verse of the Constitution, include (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like factual situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts well within the mainstream of constitutional litigation.

*Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987); *accord*, *Whiting v. Birt*, 395 F.3d 602 (6th Cir. 2005); *McMeans v. Brigano,* 228 F.3d 674, 681 (6th Cir. 2000). There is no evidence Petitioner did any of these things to present this as a constitutional claim to the Second District.

Even if Petitioner had preserved this as a constitutional claim, he presents no clearly established Supreme Court authority holding that the exclusion of this evidence violated the Due Process Clause.

> With regard to evidentiary rulings, the standard for habeas relief is not easily met. "[F]ederal habeas courts review state court evidentiary decisions only for consistency with due process." *Coleman v. Mitchell,* 268 F.3d 417, 439 (6th Cir. 2001). "A state court evidentiary ruling will be reviewed by a federal habeas court only if it were so fundamentally unfair as to violate the petitioner's due process rights." *Coleman v. Mitchell,* 244 F.3d 533, 542 (6th Cir. 2001). Moreover, such rulings "are usually not to be questioned in a federal habeas corpus proceeding." *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir.1988)). Even if errors are made in the application of state law, "[such] errors . . . especially with regard to the

23

admissibility of evidence, are usually not cognizable in federal habeas corpus." *Walker v. Engle,* 703 F.2d 959, 962 (6th Cir.), cert. denied, 464 U.S. 962, 104 S. Ct. 396, 78 L. Ed. 2d 338 (1983). If a ruling is especially egregious and "results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir. 2003) (citing *Coleman*, 244 F.3d at 542). Importantly, however, as a general matter, "state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour*, 224 F.3d at 552 (quoting *Montana v. Egelhoff,* 518 U.S. 37, 43, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996)). Ultimately, states have wide latitude with regard to evidentiary matters under the Due Process Clause. *Id.*

*Wilson v. Sheldon,* 874 F.3d 470, 475-76 (6th Cir. 2017).

To the extent Petitioner's Second Ground for Relief seeks review of the Ohio courts' evidentiary rulings, it should be dismissed for failure to state a claim upon which habeas corpus relief can be granted. To the extent that it purports to state a federal constitutional claim, it should be dismissed as procedurally defaulted for failure to fairly present that claim to the Ohio courts.

**Ground Three: Admission of Evidence of Unindicted Acts of Petitioner**

In his Third Ground for Relief, Petitioner asserts he was denied due process of law when the trial judge permitted introduction of evidence of his unindicted acts, to wit, evidence that he was in a vehicle that fired shots into Hicks's residence during the course of this extended shoot out.

Smith presented the substance of this claim as his Third Assignment of Error on direct appeal. The Second District found that no objection to admission of the evidence was made at trial and therefore review would plain error only. *Smith I* at ¶ 63. The Second District reviewed admission of the evidence only under the Ohio Rules of Evidence and found the complained-of evidence "was directly related to Smith's intent when he fired the shots that wounded Isaiah and

24

Hicks and killed Elijah, and we find nothing to suggest that the jury could have been or was confused or misled by this evidence." *Smith I* at ¶ 65.

In arguing this claim in the Amended Petition, counsel first repeats verbatim the initial citations made as to Ground Two (ECF No. 5, PageID 58-59). The claim is then argued in terms of whether the admission of the evidence was proper under the Ohio Rules of Evidence.

Ground Three is procedurally defaulted in several ways. First of all, Petitioner's trial attorney made no contemporaneous objection to the evidence. Ohio's contemporaneous objection rule — that parties must preserve errors for appeal by calling them to the attention of the trial court at a time when the error could have been avoided or corrected, set forth in *State v. Glaros*, 170 Ohio St. 471 (1960), paragraph one of the syllabus; *see also State v. Mason*, 82 Ohio St. 3d 144, 162 (1998) — has been repeatedly held to be an adequate and independent state ground of decision. *Wogenstahl v. Mitchell*, 668 F.3d 307, 334 (6th Cir. 2012),*citing Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006); *Goodwin v. Johnson*, 632 F.3d 301, 315 (6th Cir. 2011); *Smith v. Bradshaw*, 591 F.3d 517, 522 (6th Cir. 2010); *Nields v. Bradshaw*, 482 F.3d 442 (6th Cir. 2007); *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005); *Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003), *citing Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000), *citing Engle v. Isaac*, 456 U.S. 107, 124-29 (1982). *See also Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000); *Goodwin v. Johnson*, 632 F.3d 301, 315 (6th Cir. 2011); *Smith v. Bradshaw*, 591 F.3d 517, 522 (6th Cir.), *cert. denied*, 562 U.S. 876 (2010).

The Second District enforced the contemporaneous objection rule by reviewing this claim only for plain error. An Ohio state appellate court's review for plain error is enforcement, not waiver, of a procedural default. *Wogenstahl v. Mitchell*, 668 F.3d 307, 337 (6th Cir. 2012); *Jells v. Mitchell,* 538 F.3d 478, 511 (6th Cir. 2008); *Lundgren v. Mitchell,* 440 F.3d 754, 765 (6th Cir. 2006); *White v. Mitchell,* 431 F.3d 517, 525 (6th Cir. 2005); *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005); *Hinkle*

*v. Randle*, 271 F.3d 239 (6th Cir. 2001).

Petitioner's second procedural default is that he presented this claim to the Second District solely as an issue of Ohio evidence law and not as a federal constitutional claim. It should therefore be dismissed for lack of fair presentation on the same basis as Ground Two.

Even if the Court were to reach the merits of this claim, Petitioner would not be entitled to relief. Petitioner presents no clearly established Supreme Court precedent holding that when a defendant commits a felony during a course of conduct which results in indictment, evidence of felonious but unindicted conduct must be excluded at trial.

**Conclusion**

Based on the foregoing analysis, it is respectfully recommended that the Petition be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, it is also recommended that Petitioner be denied a certificate of appealability and that the Court certify to the Sixth Circuit that any appeal would be objectively frivolous and should not be permitted to proceed *in forma pauperis*.

February 1, 2021.

s/ *Michael R. Merz*
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report

and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal.

## NOTICE REGARDING RECORD CITATIONS

The attention of all parties is called to S. D. Ohio Civ. R. 7.2(b)(5) which provides:

> (5) **Pinpoint Citations**. Except for Social Security cases, which must comply with S.D. Ohio Civ. R. 8.1(d), all filings in this Court that reference a prior filing must provide pinpoint citations to the PageID number in the prior filing being referenced, along with a brief title and the docket number (ECF No. ___ or Doc. No. ___) of the document referenced.

The Court's electronic filing system inserts in all filings hyperlinks to the place in the record which has been cited following this Rule. However, as with most computer systems, the CM/ECF program cannot read pinpoint citations which do not follow the Rule precisely. For example, the first pinpoint citation in ODRC's Reply reads "Plaintiff argues that he could not bring this action until "administrative remedies as (sic) are exhausted (sic)." (Doc. 80, PageId# 987)." The correct citation would have been Doc. No. 80, PageID 987." Because Defendant added the "#" symbol, the program failed to inset a hyperlink. Use of this software is mandated by the Judicial Conference of the United States and cannot be locally modified. **The parties are cautioned to comply precisely with S. D. Ohio Civ. R. 7.2(b)(5) in any further filings.**

copy: M. Scott Criss